UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
UNITED STATES OF AMERICA

Case No. 07-Cr-1182 (KMK)

-against-

ALLEN JULIER,

Defendant.
---------------------------------------------------------------X

# DEFENDANT'S SENTENCING MEMORANDUM

## INTRODUCTION

Defendant, Allen Julier, though counsel, submits this Memorandum and attached

exhibits in connection with his sentencing scheduled for May 2, 2008.  This

memorandum is intended to provide to the Court a more complete picture of Allen Julier

than is apparent from the Information, Complaint and other documents filed herein.  It is

the first opportunity to present Allen Julier to the Court as someone more than a person

who has pled guilty to a crime.  In consideration of that portrait as well as all of the

factors enumerated in 18 U.S.C. §3553, including and notwithstanding the stipulated

advisory Sentencing Guidelines range, and the reasons set forth herein, the defendant

requests that the Court impose a sentence in accordance with 18 U.S.C. §2252A

(a)(5)(B) of time served and probation with such conditions of home confinement,

community-based treatment and supervision as are appropriate to protect the public

and enable Mr. Julier to rebuild his life.

Allen Julier entered a plea of guilty on February 1, 2008 to the single count

Information charging him with Possession of Child Pornography in violation of 18 U.S.C.

§2252A(a)(5)(B).   At the time of his plea, he was remanded to the Westchester County

Jail.[1]   The Complaint alleged that Mr. Julier possessed at least 100 images and 10 videos containing images of child pornography as the term is defined under 18 U.S.C. §3156.  In fact, the number of images and videos exceeded 500.  Mr. Julier obtained the images from the Internet.  It is acknowledged on two occasions in 2005 he utilized a credit card to purchase and/or subscribe to services that provided the images and that he received them over a period of time, until mid-2007.

The determination of the appropriate sentence under the applicable statute, 18 U.S.C. §2252A (a) (5) (B) requires the Court to consider several factors including the sentencing criteria contained in 18 U.S.C. §3553(a).  These factors are supported by the following exhibits: the numerous letters submitted on behalf of Mr. Julier by colleagues, former students, parents of former students, family and friends (Exhibit "A"), [REDACTED]     ,[2] the surrender of his teaching license (Exhibit "D"), and other exhibits, as well as the arguments advanced herein.

## RELEVANT FACTORS PURSUANT TO 18 U.S.C. §3553(a)

Following _United States v. Booker_, 543 U.S. 220 (2005), the sentencing guidelines are no longer mandatory.  Instead, Courts must now consider the impact of the factors enumerated in 18 U.S.C. §3553(a) which recognizes the guiding principle in sentencing remains "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  This Court observed, at the time of the plea, that sentencing was a "very individualistic experience" _Gall v. United States_, 552 U.S. ____, 128 S. Ct. 586, 597 (2007).  Now, the Court must fashion a

---

[1] Mr. Julier's crime was considered a "crime of violence" within the meaning of 18 U.S.C. §3143(a)(2) and remand was required despite the absence of any actual, threatened, or attempted violence on his part.  An application to continue his bail status pending sentencing was denied.

[2] This document was made available to the Court and defendant's counsel only, by the Office of Pre-Trial Services, after the evaluation was performed.  The report addresses issues of defendant's behavior, psychological profile, and whether he poses a threat to the community.  Exhibits "B" and "C" are **not** part of the public record.

sentence that "fit[s] the offender and not merely the crime" _Roberts v. United States_, 445 U.S. 552, 556 (1980) (quoting _Williams v. New York_, 337 U.S. 241, 247 (1949)). The Court must weigh all of the §3553(a) factors, but none is to be given greater weight than another.  The Sentencing Guidelines are but one of those factors.[3]  _Booker_, 543 U.S. at 259-60, 125 S. Ct. at 765-66.  The plain language of §3553(a) does not allocate or distinguish among the weight to be given to the factors listed.  Also, _Booker_ prohibits giving a greater weight to the Guidelines, as doing so, would lead to a "Guideline sentence" based on facts found by a Judge, but not otherwise established.  While the Guidelines remain the starting point, they should not be considered anymore than that, nor may they be presumed to be reasonable.  _Booke_r's minimization of the role of the Guidelines enables this Court to impose any sentence it deems appropriate so long as the sentence meets the factors of 18 U.S.C. §3553(a), that it not be greater than necessary, and the Court's reasons are adequately explained.

Allen Julier's personal history and characteristics, the nature and circumstances of the offenses to which he pled guilty, the advisory Sentencing Guidelines range and each of the other 18 U.S.C. §3553(a) factors support a sentence at the lowest end of the Sentencing Guidelines range, namely, time served and probation with community based supervision and treatment.

---

[3] Although Booker was concerned with §3353(b)(1), the same Sixth Amendment concerns require its application to §3553(b)(2). _United States v. Selioutsky_, 409 F.3d 114, 117 (2d Cir. 2005), _United States v. Sharpley_, 399 F.3d 123, 127 n.3 (2d Cir. 2005).

A.    **Section 3553(a)(1): The History and Characteristics of the
Defendant and the Nature and Circumstances of the Offense**

1.  **History and Characteristics of the Defendant**

Allen Julier comes before this Court as a good and decent man who is not immune to emotional weakness.  At 55 years old, he has had an unblemished record: including a tour of duty in Vietnam from which he was honorably discharged, the attainment of advanced educational degrees, a teaching license, and a twenty-seven year career teaching thousands of students.  He has spent the last 22 years teaching in the Art Department and Industrial Arts Department at Scarsdale High School, one of the nation's premiere public high schools.  It has among its graduates, a NASA astronaut, an Ambassador to the United Nations, a United States Senator, two Rhodes Scholars, judges, a Pulitzer Prize winning writer, the inventor of the laser, journalists, professionals, business leaders and government officials.  It is a school that demands and attracts, top quality teachers, such as Allen Julier.  His activities were not limited to the classroom.  He served as an advisor to the Outing and Environmentalist Club, Military History Club and the Young Republican Club.  He also acted as a Mentor in Senior Options, a study program where seniors pursued independent projects under his guidance.

Allen's character and reputation are attested to in the numerous letters submitted on his behalf as Exhibit "A".  Extracts of some of the letters provide further insight into Allen's qualities as a teacher and a person.  The Scarsdale High School Principal, John Klemme, observed:

"He always sought opportunities for professional development and enjoyed a good rapport with students...I never received any complaint from students or parents to

4

suggest that he had ever acted inappropriately with his pupils".

Dean of Students Michael Gibbs wrote:

"He always extended himself as a teacher to his students, helping them find ways to increase knowledge and application. He consistently gave his very best here. Allen was typically here an hour or two before the other teachers, which I always took as a mark of his commitment and preparation…Those qualities were also reflected in his interactivities with his students. He taught them, helped them, and was always available and concerned about their progress".

Barbara Leifer-Sarullo, Director of Counseling observed:

"In the over twenty years in which we have worked together, I have never heard of any impropriety on the part of Mr. Julier. Never has a student or parent spoken to me about inappropriate conduct, inappropriate language or any behaviors that can be construed in any way as offensive or improper. Scarsdale is an extremely demanding community and not one in which indiscretions would ever be overlooked…I have also been the parent of a student in his classes. My son took two courses with Mr. Julier when he was a student at Scarsdale High School and it was a very positive experience."

His teaching colleagues are acutely aware of Allen's qualities as a teacher, and a person. Robert Caie, Special Education teacher wrote:

"I always felt that he had concern for the well being of his students…He handled himself in a professional manner trying to understand a student's lack of performance or responsibility…Most of all, he cared about their learning.

Leonard Kerson recognized Allen's ability to instill confidence in his students, as well as impart knowledge:

"When I stopped in to Allen's auto workshop during the day of [sic] after school, I frequently ran into students who loved to work with him on car repairs…in that technical language that had clearly bonded him with them. These are kids for whom there was little else here that they savored and

5

Allen…provided support and appreciation for these young people…He made them feel important…That they were confident of their skills, knowledgeable and articulate about what they were doing, and thriving as students in school was Allen Julier's special gift to this school community. With his departure nothing like that remains".

The school psychologist, Dr. Ernest A. Collabolletta wrote:

"worked with Allen with some difficult students and have always admired how he has gone out of his way to understand their difficulties and try to help them in his class".

A joint letter, signed by three faculty members, one of whom was a former student, and

another the parent of one of Allen's students, described Allen as a:

"model of professionalism in our school community with a stellar work ethic" (Arrigo, Capucci, Vemes letter).

Daniel Derwin wrote as a teacher and as a parent:

"He has contributed in numerous ways to the healthy development of many young minds under his tutelage. I…know Allen on a personal basis. Allen has been associated with my four children…He has seen them grow up and has always been a positive influence to their development. My oldest girl is now twenty nine…my youngest girl is eight. I have two boys…He has been in family situations with them as well as private moments with them. Never would I have had any concern with leaving them alone for any period of time with Allen".

Former students also praised Allen Julier, as a teacher, and as a person. Jeremy

Banner, now a college senior wrote:

"…my photography course with Mr. Julier began a lifelong interest in the subject…Even when I was no longer a student of his, Mr. Julier gladly took time out of his busy schedule to assist me with any college work…His talent deserves to be shared with the world and not to be isolated in a jail cell.

Margaret Herold is the widow of the Hon. J. Radley Herold, a local lawyer and Village Justice in Scarsdale.  Their two sons were students of Allen Julier.  According to her, they:

> "experienced great satisfaction and a wonderful feeling of accomplishment as they learned automobile maintenance…They learned very practical life skills, as well as saving themselves money on repair bills.  Both sons mentioned that Mr. Julier stressed that it was important to take responsibility for oneself in life and be independent.  We are grateful to Mr. Julier for all the wonderful values which he taught."

Each of these writers, and others, acknowledged an awareness of the charges facing Allen.  None excused his behavior.   All thought that his behavior was an odd aberration.  Some sought compassion and leniency; many suggested the need for treatment.[4]  One writer, Dr. Nadine Gordon, suggested a community service requirement involving work in a nursing home.  Many writers expressed shock at allegations they found inconceivable, but, not one was going to abandon him.

Allen's teaching world was not only intact but also personally rewarding.  The same could not be said for his personal life.  A failed 13-year marriage was followed by a frustrating personal relationship.[5]  His mother was debilitated by a double mastectomy, two colonectomies, cataracts, glaucoma, macular degeneration and dementia.  She had no insurance.  Allen cared for and provided for her in his home until her death in April 2007 at the age of 93.  In doing so, he became an emotional prisoner and found escape on the Internet.  Surfing led to adult pornographic images and

---

[4] In a recent decision, the expressed sentiment of the jurors for treatment, rather than incarceration, was a factor that led the trial judge to vacate a pornography conviction and order a new trial.  "Admitting Error, Judge Throws out Child Pornography Conviction" N.Y.L.J. April 2, 2008, p. 1 (copy submitted as a courtesy, Exhibit "E"), _U.S. v. Polizzi_, 2008 WL 877164.

[5] Letters from his former girlfriend, Nancy Epstein, and her daughter, Nina Rogowksy, are submitted as part of Exhibit "A".

gradually led to images of teenagers and some prepubescent children. This small solitary corner of Allen's life did not manifest itself in any form other than Internet images which were downloaded onto his computer. None of the images depicted violence, sadism, masochism, penetration or painful acts. No attempt to involve his students or others was made. No attempt was made to sell or distribute the images. No attempt was made to interact with other people in the child pornography world. No attempt was made by Allen to contact, chat, induce or otherwise communicate with persons depicted in these images. Allen was acutely aware of a line not to cross. They were images, not real people. Certainly, as a teacher surrounded by high school students, the opportunity was present if he was so inclined. This corner of his life was kept from his colleagues at school and from his closest friends. His friends may have been aware of the devotion to his mother and the toll it took on him, but they were not aware of how he acted out in this time period.

Bill Owens, a friend of Allen's for 42 years, wrote of Allen's devotion:

> "He never put her in a nursing home and made sure that she had constant care at home until her death. He arranged his life so that he could take care of his mother at great personal sacrifice. It was a considerable social and financial burden which Allen bore with dignity".

Owens went on to say:

> "Through all of this, Allen never complained, yet I wondered about the personal toll his mother's condition and death and his failed relationships had taken on him. Despite our closeness, Allen did not confide his despondency to me. Allen has always had a great deal of responsibility and he has dealt with it honorably".

8

Lauren Sucich, a social worker and friend wrote that Allen "had vowed that she [his mother] would never have to live in a nursing home and he kept this promise to her and to himself".  She added:

> "Professionally, I have worked as a social worker for nearly 20 years.  I believe that Allen was suffering from a long standing depression brought on by the ending of his marriage and the breakup of another significant relationship, coupled with the unrelenting demands of caring for his mother's physical, emotional, and financial needs. Individuals under such stress often seek relief or "self-medicate" using a variety of different means (alcohol, drugs, gambling, etc.) I think Allen became involved in Internet activities as a distraction and numbing escape.  At some point, however, this involvement crossed a line much like when a person using alcohol to relieve stress receives a DWI.
>
> In my work in diversion programs, I have interviewed many individuals like Allen: people who have never been in trouble with the law before but who have been arrested for an offense like DWI.  These are solid, upstanding citizens who are mortified by their transgression and highly motivated to rectify the situation in any way they can.  They are referred for evaluations, treatment and educational services as an alternative to incarceration and they succeed."

His former sister-in-law, Robin Melen, put it succinctly:

>  "The chronology of his mother's failing health coincides with his venturing into the internet abyss and cannot be ignored; yet, neither can the behavior be excused".

These letters, and others, submitted on behalf of Allen contain a  recognition that he is a good, decent, caring, and compassionate man who can be counted on to do the right thing. It is not surprising that the writers seek not only leniency for Allen but also they seek help for him. The sentiments expressed in the letters reflect Allen's willingness to face his situation.  His colleague, Robert Caie, wrote of his visits and conversation with Allen:

"We talked for several hours and had a meal together. I found Allen to be very open about the charges against him…I found a man who admitted his guilt, a man who knew that he had done wrong, a man who felt trapped into the addiction of pornography, and a man who was willing to seek help to overcome his addiction….I felt his remorse….I recently visited him at the Westchester County Jail. I found a man who wants to change, a man who wants to have a positive impact on the lives of people. He believes that things happen for a reason and possibly his circumstances can be used for good."

Mr. Caie's letter illustrates Allen's acceptance of personal and moral responsibility, and the blame resting squarely on his shoulders. It is consistent with the character of a respectful, hard working person, who because of a small chapter in his life, has jeopardized all that he achieved at work, at home, and in the eyes of friends, family, community, and those who believe in him. Allen Julier's

"good deeds were not performed to gain status or enhance his image. Most of them were unknown to all but a few people until the time of his sentencing. But, surely, if ever a man is to receive credit for good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed Courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*U.S. v. Adelson*, 441 F. Supp. 2d 506, 513, 514 (S.D.N.Y. 2006).

B.    [REDACTED]

There can be no doubt that Allen Julier has been a productive and contributing member of society. He is before this Court revered as a teacher and reviled as a possessor of child pornography. The charged behavior is in stark contrast to the values

10

and morals that guided him for more than fifty years. He has acknowledged his bad behavior; his overwhelmingly positive life and career should not be ignored.

Allen Julier has influenced thousands of lives in positive ways: as a high school teacher he has imparted knowledge, guidance, direction, wisdom and humanity both inside and outside the classroom; as a dutiful son, his care for his mother reflects a humility and compassion that is infrequently seen.  These traits are part of the "history and characteristics" of Allen Julier that warrant favorable consideration under 18 U.S.C §3553(a)(1).  Perhaps most important is that Allen Julier has evidenced not only the need to change, by ending the downloading before his arrest, but also, the ability to do so.  Such recognition bears directly on the character of Allen Julier, and lessens the need for incarceration to protect the public.  This history and characteristics warrant a sentence at the lowest end of sentencing possibilities.

### 2.     **Nature and Circumstances of the Offense**

Mr. Julier pled guilty prior to Indictment.  He admitted to downloading images of child pornography on his computer.  He did so freely and voluntarily and fully accepted responsibility for his actions.  There is nothing in his background to suggest that this behavior was associated with any other criminal conduct.  The possession must be fairly separated from distribution, production, enticement, receipt, and other forms of prohibited conduct.

Mr. Julier's possession of child pornography was an outgrowth of a depression of [REDACTED]

.  Among the images found on Mr. Julier's computer were images of adults, some images of teenagers/adults where the age was uncertain, images of child pornography and some images of prepubescent girls.  The images included nudity and some

11

sexually explicit behavior.  There was neither sadism nor masochism or other more extreme behaviors.

There was a clear boundary between the cyber world and the real world.  No allegation has been made concerning contact, enticement, or inducement or other inappropriate dealings with minors.  No such allegation has ever been made in the school where Allen taught.  His outlet was confined to the Internet and his computer only within his home; no physical evidence of child pornography was found anywhere in Mr. Julier's home.    Mr. Julier was forthright when confronted at his home by Immigration and Customs Enforcement agents (ICE) on September 4, 2007.  He acknowledged downloading and possessing pornographic images, and did so without immunity or invoking the right to counsel.  He was cooperative with the agents, without full knowledge of the fate that awaited him.  In doing so, he accepted responsibility without equivocation, and he continued to do so as evidenced by his demeanor and responses at the time of his allocution and plea.  Such conduct clearly supports the two-level reduction provided in the Sentencing Guidelines, and the additional one-level reduction provided for in USSG §3E1.1(a) and (b).

> 3.    **Section 3553(a)(2): The need for the Sentence Imposed
> to Reflect the Seriousness of the Offense and Provide
> <u>Just Punishment and Deterrence</u>**

This Court is required to "impose a sentence sufficient, but not greater than necessary to comply with the [following] purposes": "(A) to reflect the seriousness of the offense, to promote respect for the law, and the provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the

most effective manner." 18 U.S.C. §3553(a)(2).  These factors support a sentence of

probation for Allen Julier with supervision, treatment and home confinement following

his three month incarceration at the time of his plea.

The "just punishment" for conduct manifested by illness must focus on the illness,

especially where the conduct does not directly harm others.  Deterrence of others is

best served by treatment which allows a person to remain a productive member of

society; it need not simply be a mechanical "lock the door and throw away the key"

approach.  There is no indication of continuing criminal activity on the part of the

defendant.  He has begun the process of counseling and treatment to address the

issues giving rise to his behavior.  Neither the assessment performed by the New York

Center, nor the report of Dr. Weiler provides a basis to believe that Allen Julier will

commit further crimes.  The prospect of recidivism is minimal.  Recidivism rates decline

relatively consistently as age increases.  Measuring Recidivism: The Criminal History

Computation of the Federal Sentencing Guidelines (2004),

www.ussc.gov/publicat/recidivism_General.pdf.  Among Criminal History Category I

offenders over the age of 50, the recidivism rate is 6.2 percent (*Id., p. 28*).  Incarcerated

offenders have a higher recidivism rate than those on probation (*Id., p. 12*).  His

continued psychological treatment is the best indicator of rehabilitation and appropriate

behavior which addresses the purposes of sentencing.

Allen Julier's guilty plea has had a devastating impact on him.  Beyond his

immediate incarceration, a nearly thirty-year teaching career has come to a tragic end.

He resigned his position and his teaching license has been surrendered (Exhibit D).

The surrender of his license was voluntary.[6]  Allen Julier has never minimized the seriousness of his crime.  He has begun to realize not only the factors that gave rise to his behavior, but also how child pornography exploits and harms children.  On the surface, measuring the harm of viewing child pornography in the privacy of one's home is difficult, until one understands that the harm caused by such exploitation is continual, haunting and immeasurably destructive to the children involved.

It is significant that he never saw his students in the way he viewed the images on the computer.  Harming a child is an anathema to a man who has spent a career teaching children.   He is neither a pedophile nor is he at risk for abusing children.  There is no violence, nor threats of violence, in connection with the possession of the pornography.

While such a wound is self-inflicted, its depth and pain should not be ignored.  The substantial financial loss, combined with Mr. Julier's inability to use his teaching skills requires rebuilding his life.  At age 55, it is a difficult task.  The task is made more difficult by the civil restrictions placed on the nature of the offense, such as 15 years of sex offender registration pursuant to 42 U.S.C. §16915(a)(1), New York State Sex Offender Registration for 20 years §168-h(1) (N.Y. Corr. Law §§168, et. seq. McKinney), living and residence arrangements pursuant to Local Law #9, of 2007, Putnam County, "Child Safety Zones" (Exhibit "F"), employment limitations, notification requirements for job, residence and vehicle changes, etc., all of which further serve to provide general and specific deterrence.  It is patently obvious that Mr. Julier poses no threat to the community, and it is equally obvious that there is no need for any additional

---

[6] Although the surrender of his license was discussed with the Assistant United States Attorney, Nola Heller, it was not included as a condition of the plea herein.

14

term of imprisonment for a man who has led a completely law abiding life, served his country, and has spent nearly three decades imparting wisdom to our nation's youth. His recognition, treatment, and understanding of his actions also serve as a deterrent.

The deterrent impact of Mr. Julier's arrest and prosecution is apparent. He has lost his livelihood, his career, his primary source of income, his reputation, and his dignity. In _U.S. v. Adelson_, _supra_, the loss of reputation was seen as a specific deterrent that rendered it "extremely unlikely" that the defendant "would ever involve himself in future misconducts (_Id. 514_). These assets have been replaced by shame, humiliation, disgrace, and, most recently, incarceration. The arrows labeled "felon" and "sex offender" wound deeply and leave lifetime scars. So too, a long term of supervised release, and the costs of defense provide specific deterrence. A term of imprisonment will not achieve individual deterrence nor will it serve the goal of general deterrence. The particular cause of the behavior condemned here does not lend itself to incarceration as a means of deterrence; instead, treatment is a more effective means of deterrence. Allen's lack of criminal history militates against the higher sentence required by dogmatic application of the Guidelines. It is, therefore, submitted that a term of probation or home confinement, with appropriate conditions and community-based supervision will provide substantial deterrence.

In _United States v. Gaind_, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), _aff'd_, 31 F.3d 73 (2d Cir. 1994), the District Court granted downward departure where:

> "elimination of defendant's ability to engage in similar or related activities – or indeed any major business activity – for some time, and the substantial loss of assets and income resulting from this have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake, and constitutes both individual and general deterrence."

15

Indeed, probation carries its own deterrent effect. *See Gall v. United States*, 552 U.S. _____, 128 S. Ct. 586. The Supreme Court in *Gall* emphasized the "substantial restriction of freedom' involved in a term of … probation, rather than viewing it as an "act of leniency":

> Offenders on probation are…subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' "(quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). [Footnote omitted] Probationers may not leave the judicial district, move or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officers, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG §5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

*Id. 595, 596.* The extensive period of supervised release (five years to life) (18 USC §3583(k)) provides reasonable assurance that Allen Julier will receive not only the supervision but also the mental health care he needs (18 USC §3583(k)). There is no evidence to suggest defendant would act out by inappropriate contact with a minor.

There is no reason to believe Allen Julier will be a danger to the public or a threat to the community. Indeed, he has never been a "threat" in the sense of physical conduct. His physical actions have been limited to clicking a computer "mouse" as a means of entry to a cyber world. Even that access can be limited with appropriate software filters and limits on computer use. [REDACTED].

Criminal activity arising from psychological conditions is neither the type of activity for which a message needs to be sent, nor is it one for which the defendant must be made an example. Instead of such general deterrence practices, this Court

has the power to fashion specific individual-based deterrence that can promote lawful behavior. In addition to the time defendant has been incarcerated, curfews, house arrest, required reporting, treatment, supervision, and electronic monitoring all serve to promote compliant law abiding behavior. The sword of Damocles hanging over Allen Julier to promote future law abiding behavior is real. Allen Julier is now 55 years old, an age at which individuals normally do not engage in anti-social behavior to the same extent as younger individuals, notwithstanding the relatively recent emergence of these behaviors in Mr. Julier.

While punishment is a component of any sentence which the Court may impose, such a sanction should bear some proportionality to the act, and its harm. Here, the nature of the act is one of pure possession, without distribution or trafficking, and the harm, though indirect, is concededly a kind to be eliminated. Yet, the continued incarceration of Mr. Julier will not eliminate the harm, nor is it likely to deter others.

### 4. <u>Section 3553(a)(3): The Kinds of Sentences Available</u>

A term of probation is available under the statute of conviction, 18 U.S.C. 2252A (a)(5)(B), but it is not available under the Advisory Sentencing Guidelines §5C1.1. The Court has the discretion to impose a minimum sentence of no jail time or a sentence up to the ten-year statutory maximum for the crime admitted by Mr. Julier. In enacting 18 USC §2252A(a)(5)(B), Congress granted the Courts broad discretion to impose a wide variety of sentences, from probation to five years (later then years) imprisonment, according to the facts of each case. Under 18 USC §2252A(b)(2), the Courts were specifically authorized to impose probation when justice dictated such a sentence. However, the Courts' authority to sentence according to conscience was administratively repealed by the Sentencing Commission which established a Base

Offense Level of 18, mandating that all defendants serve at least 27 months in prison. In so doing, the Sentencing Commission ignored the plain language of the statute as well as the expressed intent of Congress.  When Congress increased the maximum term of imprisonment from five to ten years, it also reaffirmed its intent that the Courts have discretion to impose probation, as well as imprisonment.  Clearly, Congress intended to grant the Courts the power to show mercy where the facts dictated such a result.  However, the Sentencing Commission once again ignored the plain language of the statute and the expressed will of Congress and created a sentencing scheme that imposed mandatory prison time, a result which Congress never intended.  This Court has no obligation to purposefully ignore the Congressional intent by following the Guidelines.  The facts before this Court evidence the wisdom of Congress' sentencing scheme and militate against the inflexible approach imposed by the Sentencing Commission.  The defendant and his actions warrant a sentence of probation.  Unlike many defendants, Mr. Julier is not a self-centered individual, devoid of conscience. Indeed, the door to probation was left open precisely for people like Allen Julier who devoted his adult life to public service in the military, and teaching, who always put others first, and who is the epitome of selfless behavior.  Given Allen Julier's history and personal characteristics, a term of probation would be an appropriate sentence in this case together with home confinement, community based treatment, psychological counseling and supervision. The types of special conditions applicable to Mr. Julier would provide additional controls on his behavior and protect the public.  This type of sentence would provide for just punishment and adequate deterrence while allowing Mr. Julier an opportunity to try to rebuild his life and redeem himself.

5**.**        **Section 3553(a) (4), (5): the Sentencing Range Established**

**by the Sentencing Guidelines**

The Plea Agreement sets forth the correct advisory offense level computations. The Guideline Offense Level is 24 and the Defendant's Sentencing Guideline range is 51 to 63 months, and the possible imposition of a fine.

However, the Guideline Offense Level of 24 includes impermissible double counting because the Base Offense Level of 18 and the Specific Offense Characteristics increase the levels by 2, for the same element – the use of a computer. The use of a computer here is an element of the offense under 18 U.S.C. §2252A (a)(5)(B) and is covered by the Base Offense Level set forth in Guideline 2G2.2. The same use of a computer is a Specific Offense Characteristic under Guideline 2G2.2 (b)(6). Thus, the same conduct is counted twice for the same purpose. In reality, Mr. Julier could not have used the computer to commit the offense of possession without committing the offense of possession, any more than Columbus could have sailed across the ocean without wind. The Second Circuit explained that an impermissible double counting exists under particular circumstances:

> "The Guidelines limit upward departures to where the Court "finds that there exists an aggravating …circumstance of a kind or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines" 18 U.S.C. §3553(b). Thus, where the particular factor has already been considered in setting the base level, counting the factor again in making a departure violates §3553(b) unless the factor is present in a degree which the Commission did not consider. *See e.g. United States v. Coe*, 891 F.2d 405, 410 (2d Cir. 1989) (error to depart upward because of fact of multiple robberies since multi-count analysis in guidelines already accounted for that factor); *United States v. Palta*, 880 F.2d 636, 640 (2d Cir. 1989) (improper to depart upward for concealment of identity since Guidelines consider obstruction of

19

justice) <u>United States v. Colon</u>, 905 F.2d 580, 585-86
(2d Cir. 1990) (error to depart upward for role in the
offense since Guidelines address the issue)."

(emphasis added). <u>United States v. Campbell</u>, 967 F.2d 20, 23-4 (2nd Cir. 1992). Unlike

charged conduct involving a pattern of activity or the transmission of images, the

relevant conduct here is possession utilizing a computer; no other conduct is alleged.

Guideline 1B1.3(a)(1)(A) identifies the relevant conduct for purposes of Guidelines

determinations as "[a]ll acts and omissions committed…or willfully caused by the

defendant"…"that occurred during the commission of the offense of conviction". Such

relevant conduct does not allow for an artificial distinction between the use of a

computer for determining a Base Offense Level and the use of a computer as a specific

Offense Characteristic. One cannot be in possession of child pornography found on a

computer without using the computer to possess it. The problem is exacerbated and

stripped of logic when the crime of possession is connected with other behaviors such

as trafficking in chapter 110.  The effect is to graft particular behaviors for other crimes

onto the crime of possession.  Although conduct that is not formally charged, or not an

element of the offense of conviction may enter into the determination of the applicable

range under 1.B.1, there is no corresponding affirmative obligation to twice include

charged conduct that includes an element of the offense of conviction in determining the

applicable range, as part of the Base Offense Level and as a Specific Offense

Characteristics.  Consequently, the double counting should be eliminated and the

Guidelines minimum should be adjusted accordingly to a range of 41 – 51 months.

In addition, the two-point enhancement for the use of a computer USSG

§(2G2.2(b)(6)) unfairly boosts the penalty, and effectively raises the Base Offense Level

from 18 to 20, as the statute involved here, 18 U.S.C. §2252A(a)(5)(B) requires the use

of a computer as the mechanism for pure possession as the violation. In contrast, the other sections of §2252A require possession plus action for the 2-point assessment to apply. That action includes mailing and transporting (§2252A (a)(i)) receiving or distributing (§2252A (a)(2)) reproducing (§2252A (a)(3), sells or possesses with the intent to sell (§2252A(a)(4)). The Congressional Findings in support of the "Child Pornography Prevention Act of 1996" dwell heavily on production, distribution and trafficking in child pornography, and less so on pure possession, which is relegated to the twelfth of thirteen Congressional Findings. P.L. 104-208, Sec. 121(1). _United States v. Grosenheider_, 200 F. 3d 321, 332 (5th Cir. 2000) ("It is clear that Congress established a series of distinctly separate offenses respecting child pornography, with higher sentences for offenses involving conduct more likely to be, or more directly, harmful to minors than mere possession offense" Id. 332-33, quoted in _United States v. Johnson_, 221 F. 3d 83, 98 (2[d] Cir. 2000) cert. denied 533 U.S. 953 (2001), _United States v. Dotson_, 324 F. 3d 256 (4th Cir. 2003). The distinction is premised on laws of supply and demand. _United States v. Richardson_, 238 F. 3d 837 (7th Cir.) cert. denied 532 U.S. 1057 (2001). In other words, the transmission or receipt is different from possession and the use of a computer to possess, is for purposes of possession and not distribution or trafficking. _United States v. Lorge_, 166 F. 3d 516 (2[d] Cir.) cert. denied 526 U.S. 1058, 119 S. Ct. 1372 (1999).

The distinction between possession and transmission, receipt, distribution, etc. has been long recognized in the Sentencing Guidelines. _United States v. Farrelly_, 389 F. 3d 649 (6th Cir. 2004), _U.S. v. Parmalee_, 319 F. 3d 583 (3rd Circ. 2003), _United States v. Parish_, 308 F. 3d (9th Cir. 2002). USSG §2G2.2 as originally drafted, focused on matters involving trafficking and distribution of child pornography. USSG §2G2.4

21

focused on possession of child pornography by an individual defendant. The two sections were consolidated in 2004.[7] The Amendment was intended to implement the "PROTECT Act".[8] The consolidation addressed concerns regarding difficulties in determining the appropriate guideline (§2G2.2 or §2G2.4), but did not alter the existing distinction between distribution and possession.

There is nothing in the consolidation of Sections 2G2.2 and 2G2.4 to eliminate the distinction given to pure possession. That distinction can only be retained by including the use of a computer as part of the Base Offense Level, instead of counting it a second time as a Specific Offense Characteristic. As a result, the use of the computer, as an element of the offense, here the possession of the images should not be double counted to increase the punishment. Thus, Mr. Julier is assessed 18 points for his actions in using the computer and he should not be again assessed two points for using a computer. No definition of "reasonable" can justify a double counting.

6.    **Pertinent Policy Statement and the Need to Avoid Disparities**

The Sentencing Guidelines, as amended, accompanied by policy statements are not only of limited utility but actually serve to promote sentencing disparity. The periodic adjustment of points and offense levels, for example, increases the range of potential sentences, and renders useless the comparative cases that relied on the same acts, but which result in different totals. Here, the Base Offense Level is 18 (Guidelines Manual, §2G2.2. That Base Offense Level carries with it a minimum period of 27 months imprisonment if the Criminal History Category is I. The original Base Offense Level was

---

[7] USSG App. C, Amendment 664
[8] Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, Pub. L. 108-21

13 until the Sentencing Commission increased that to 15 in 1991,[9] then to 17 in 1996,[10] then to 18 in 2004.[11]  In addition, the maximum term of imprisonment was increased from 5 years to 10 years in 2003 (but the minimum term of no jail time was unchanged).[12]  By raising the bar, the Court is limited to those cases which occur after the Offense Level is raised to avoid disparities, and to avoid the risk of _ex post facto_ legislation.  See, e.g., _Miller v. Florida_, 482 U.S. 423 (1987).  Here, the 2004 amendment which increased the Guidelines range from 17 to 18 essentially ignores the non-incarceration option specifically enacted by Congress when it adopted 18 U.S.C. §2252A (5)(a).

The desire to avoid or eliminate sentencing disparities necessarily conflicts with the:

> "uniform and constant federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue".

_Koon v. United States_, 518 U.S. 81, 113 quoted in _Gall v. United States_ 552 U.S. ____ 128 S. Ct. 586 at 598.  Here, extra caution is necessary to avoid lumping Mr. Julier together with other violators of 18 U.S.C. 2252A or Chapter 110 offenses, as his conduct of possession is far different from the similarly grouped violations that involve distribution and trafficking.  _Booker_, _supra_, 543 U.S. at 253-54.  Unfortunately, the in-artful Congressional drafting has lumped Chapter 110 offenders together.

---

[9] U.S.S.G., App. C, amend. 435
[10] U.S.S.G., App. C, amend. 537
[11] U.S.S.G., App. C, amend. 664
[12] Pub. L. No. 108-21, §103(a)(1)(E)(i) 117 Stat. 650, 652 (2003)

Another factor to consider is the disparity between New York's penalties for a comparable offense.  Section 263.11 of the Penal Law of New York prohibits the possession of a sexual performance by a child.  It is a Class E non-violent felony, within a minimum sentence of probation and a maximum indeterminate term of 1 1/3 to 4 years in prison.  While the comparison is neither binding nor controlling on this Court, it is a legitimate factor for consideration.

The recent decisions in _Booker_, _Gall_, and _Kimbrough_, among others, add further chaos to the sentencing scheme contained in the Guidelines. The original mandatory/binding nature has been reduced to "advisory only", and effectively replaced by that which the Court determines to be reasonable regardless of the Guidelines. _Kimbrough v. United States_, 552 U.S. ____, 128 S. Ct. 558, 564 (2007).  The mandatory nature of the Guidelines combined with narrow deviations and strict appellate review evolved into a system of rigid sentencing without regard to subjective factors related to the individual defendant.  _Rita v. United States,_ 551 U.S. _____, 127 S. Ct. 2456 (2007) allowed for sentences outside the Guidelines to be "reasonable". _Gall_ rejected the proportionality approach to the deviation from the Guidelines based on "extraordinary circumstances" in favor of a determination that a sentence was "reasonable" under the circumstances of the case.  This analysis was expressly approved by the Supreme Court when it adopted the reasoning of the District Court in determining whether the sentence imposed was "reasonable".[13]  Consequently, this

---

[13] Sentences imposed prior to _Booker_ and _Gall_, which were reversed, would be valid today, absent an abuse of discretion.  Consequently, prior holdings are of limited precedential value.  See e.g. _United States v. Stevens_, 29 F. Supp. 2d 592 (D. Alaska 1998), reversed 197 F. 3d 1263 (9th Cir. 1999) (sentence of 12 motions and one day reversed), _United States v. Barton_, 76 F. 3d 499, 501 (2d Cir. 1996), _United States v. Nunemacher_, 362 F. 3d 682 (10th Cir. 2004) (8 level departure – not reasonable), _United States v. Silleg_, 311 F. 3d 557 (2d Cir. 2002) (District Court misapprehended authority to depart downward on basis of diminished capacity), _United States  v._

Court can and should rely on the subjective factors such as age, health, lack of criminal record, rehabilitative, community activities, etc. rather than the unfair dogmatic approach of the Guidelines in determining a sentence that is "sufficient but not greater than necessary" to meet the goals of 18 U.S.C. §3553(a)(2). Given this changing criteria, any reliance on sentences imposed prior to _Gall_, are of limited, if any, utility.

In the event the Court determines that a guideline sentence is applicable, defendant seeks a downward departure based on factors including his mental and emotional condition, the aberrational nature of his conduct, employment record, and his lengthy law-abiding life. To the extent that "departures" still exist, these factors warrant a departure within the meaning of USSG §5K2.0, and _Koon v. United States_, 518 U.S. 81 (1996).

The exact role of departures in the statutory scheme is clouded. The virtually non-existent departure authority created by Congress is, at best, "advisory only" and should not stand in the way of a reasonable sentence to the extent it is still required. Mr. Julier asks this Court to depart from the Guidelines based on the mitigating factors of §3553. _Booker_ makes clear that the guideline limitations on departures are no more binding than the guideline ranges themselves. _U.S. v. Ranum_, 353 F. Supp. 2d 984 (E.D. Wisc., 2005). Indeed, there is an affirmative obligation to consider so called "departure factors" to comport with the requirement that the Court evaluate defendant's history and characteristics of the defendant and the nature of the offense. _U.S. v. Myers_, 353 F. Supp. 2d 1026 (S.D. Iowa, 2005). This Court's role and obligation – to bring compassion and common sense to the sentencing process can best be achieved

_Camiscione_, 2006 U.S. App. Lexis 30220 (6th Cir. 2006) (unpublished) (sentence of one day and three years supervised release failed to consider certain §3553(a) factors.

by imposing a sentence that provides individualized justice.  _U.S. v. Williams_, 65 F. 3d 301, 309-310 (2d Cir. 1995).  That individualized sentencing avoids reducing punishment "to an algorithm".  _U.S. v. Blareck, II_, 7 F. Supp. 2d 192, 211 (E.D.N.Y., 1998).

The holdings in _Booker_, and _Selioutsky_, allow for departures in situations involving diminished capacity and it has been applied to child pornography cases.  _U.S. v. Silleg_, 311 F. 3d 557 (2nd Cir. 2002), USSG §5K2.0, 5K2.13.  Similarly, it also exists for conduct that is considered aberrational USSG §5K2.20.  [REDACTED], especially in light of his law-abiding life for more than 50 years.  The Court may also consider his military service and teaching career under 5H1.11 _U.S. v. Canova_, 412 F. 3d 331, 358-59 (2d Cir. 2005).  Congressional limitations on "departures" for chapter 110 offenses are of little significance to the advisory Guideline scheme. There is no longer any bar to imposing a more lenient sentence simply because it involves a Chapter 110 offense.

       7.    **Restitution**

Restitution is not an issue on the facts of this case.

## CONCLUSION

For all of the foregoing reasons, as well as proper consideration of the factors set forth in 18 U.S.C. §3553(a), Allen Julier respectfully requests the Court to impose a sentence that includes a term of probation with such conditions as the Court deems appropriate including time served, supervised release, home confinement, and psychological counseling.

Dated:  April 16, 2008

26

Respectfully submitted,

_____
Victor G. Grossman (1409)
Attorney for Defendant
Office & P.O. Address
9 Fair Street
Carmel, New York 10512
(845) 225-0334

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2008, I electronically filed the foregoing Sentencing Memorandum of Allen Julier using the CM/ECF system, which sent notification of such filing to the following:

AUSA Anna Skotko
Anna.skotko@usdoj.gov

I hereby certify that on April 17, 2008, I served a copy of the foregoing Sentencing Memorandum of Allen Julier on:

AUSA Anna Skotko
United States Attorney's Office
300 Quarropas Street
White Plains, New York 10601

by then and there placing a true copy of the same, properly addressed, with the appropriate postage affixed, in the custody of the United States Postal Service.

_____
Victor G. Grossman